Frank D. Mylar (5116)
Mylar Law, P.C.
2494 Bengal Blvd.
Salt Lake City, Utah 84121
Phone: (801) 858-0700
office@mylarlaw.com

Attorney for Weber County Defendants

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MICHELLE SHAFER, by her Personal Representative, ASHLEY EVAN JESSOP, <br><br> Plaintiff, <br><br> v. <br><br> WEBER COUNTY, et al., <br><br> Defendants. | **DEFENDANTS' REPLY MEMORANDUM IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT** <br><br> Case No. 1:18-cv-20- RJS <br><br> District Judge Robert J. Shelby |

Defendants Weber County, Terry L. Thompson, and Allen Jacobsen, through their attorney Frank D. Mylar, respectfully submit this Reply Memorandum in Support of Their Motion for Summary Judgment as follows:

## **REPLY INTRODUCTION**

Plaintiff's Opposition Memorandum is unable to identify any disputed issue of material fact that would preclude summary judgment in this matter. No Defendants were deliberately indifferent to Decedent Ashley Jessop's medical needs. Jessop's death, while unfortunate, was not the result of any constitutional deprivation. In fact, Jessop did not even die in the Jail. Defendant Jacobsen did not have any reason to believe Decedent was suffering from any serious medical need

when he observed him, and Sheriff Thompson did not think there were deficiencies with how medical care was provided at the Jail. There is no basis for constitutional liability with these facts and Plaintiff's suit should be dismissed with prejudice.

## REPLY TO STATEMENT OF UNDISPUTED MATERIAL FACTS

Plaintiff's failure to dispute Defendants' material facts requires that summary judgment be entered in favor of Defendants. Plaintiff disputes Defendants' Statement of Undisputed Facts listed in Paragraphs 6, 7, 11, and 22 of Defendant's Motion for Summary Judgement. The rest of Defendants' facts are undisputed. The facts that Plaintiff uses in response includes factual statements that frequently take deposition testimony out-of-context or unnecessarily confuses the material facts, and therefore require the following replies:

**Reply to Paragraph 6:** In citing Sheriff Thompson's deposition, Plaintiff concludes that "Sheriff Thompson failed to provide training to his officers regarding WSCO's polices." (Doc. No. 32 at 4). Plaintiff references deposition testimony about day-to-day Jail operations that Sheriff Thompson may or may not have been aware of. However, Plaintiff's citations are all within the context of the Sheriff's statements that he assigned training and day-to-day operations of the Jail to competent managers who would have alerted him to problems with training or policies. The Sheriff noted, "I have trust and confidence in my staff. That's their duties and responsibilities, to make sure if there's issues or concerns, they come to my attention, we address it. There were none." (Thompson Depo. 87:12-15). Plaintiff provides no evidence that anyone alerted Sheriff Thompson to a policy or training insufficiency that he could have acted upon. As detailed below, the specific citations Plaintiff string cites from Sheriff Thompson's deposition are insufficient to create a dispute about this material fact:

**57:25-58:2** – This is a hypothetical question and answer. Such a hypothetical exchange does not create a dispute about whether Sheriff Thompson was aware of a constitutionally deficient policy or procedure.

**76:4-77:6** – This is a discussion about how jailers could create either written or digital logs of their safety checks. This citation does not create a dispute about whether Sheriff Thompson knew of issues that alerted him to constitutionally deficient policies or procedures.

**79:7** – This citation, in context, is Sheriff Thompson communicating that he did not directly conduct policy and procedure trainings for Jail staff. Instead he had trusted employees conduct those trainings. This citation does not create a dispute about whether Sheriff Thompson knew of constitutionally deficient jail policies or procedures.

**80:15-17;  83:6-25;  85:19;  86:25-87:15;  89:22-25;  201:5-23** – These citations are testimony regarding whether Jail staff did or should have logged 60-minute checks for inmates in the booking area, or whether such logs were superfluous since inmates in the booking area were under continuous monitoring. This does not create a question of fact as to whether Sheriff Thompson was aware that Jail staff was not following proper procedures or policies, or that those procedures or policies were constitutionally deficient.

**84:8-11** – This citation is taken from a larger discussion about how Sheriff Thompson delegated the implementation of policies and procedures to trusted staff members and relied on them to suggest changes if changes were needed. This citation does not create a dispute about whether Sheriff Thompson knew of constitutionally deficient jail policies or procedures.

**105:22-106:1** – Sheriff Thompson noted that there could be occasions at the Jail when a jail commander or watch commander was not on duty but there was always a continuous supervisor

3

(i.e., an Officer in Charge). (Thompson Depo. 106:2-12; 182:25-183:22). This statement does not show that Sheriff Thompson knew anything that caused him to believe the Jail's policies or procedures resulted in constitutionally defective medical services at the Jail.

**184:25-185:8** – This merely cites a lack of knowledge on the part of the Sheriff. The Sheriff simply was not able to answer the question from his own knowledge. This citation does not show that Sheriff Thompson was aware of a problem with policies and procedures that caused any alleged constitutionally defective medical services at the Jail.

**137:5-139:25; 142:14-22; 143:20-144:3; 144:4-10** – These citations are a discussion of whether the Intake Screening Form is the same thing as a medical screening form. Since the Intake Screening Form had questions about mental health, physical health, prescription drugs, emergency health needs, and was signed by medical personnel, Sheriff Thompson said he believed the Intake Screening Form was what Jail policies and procedures envisioned as an initial medical screening. This lengthy discussion does not show that Sheriff Thompson was aware of any constitutionally deficient policies or procedures at the Jail. "If either doctors, either Dr. Wood or Dr. Haw, or my jail commander had any issues with [using the Intake Form as a medical screening device], they would bring them to me . . . if there was any concerns about any of our operations, they would have been brought to me." (Thompson Depo. 138:19-20; 139:9-10).

Moreover, Sheriff Thompson was not aware of any policy or training defect and relied on his competent managers to bring defects to his attention. Plaintiff provides no evidence that the Sheriff was ever notified of any of these alleged defects. "There's no problem or concern that I'm aware of that was brought to my attention." (Thompson Depo. 84:19-20). "If there was a problem that had come to my attention, we would have addressed it." (Thompson Depo. 84:24-25). "I have

trust and confidence in my staff. That's their duties and responsibilities, to make sure if there's issues or concerns, they come to my attention, we address it. There were none." (Thompson Depo. 87:12-15). "Q: To your knowledge, was there any issues ever brought to your attention of problems of officers in the booking area not being vigilant enough in watching the inmates that are in the cell? A: No." (Thompson Depo. 208:15-19).

**Reply to Paragraph 7:** See Reply to Paragraph 6 above.

**Reply to Paragraph 11:** Defendants agree that Mr. Jessop's Intake Screening form indicated he took psychiatric medications, had previously suffered from seizures, and was "all most" suicidal. Defendants' fact was indicating that there was no obvious medical injury or obvious reason for Mr. Jessop to immediately see a medical professional for any physical ailments.

**Reply to Paragraph 22:** Plaintiff does not dispute that these are the diseases that led to his Decedent's death.

## RESPONSE TO PLAINTIFF'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Defendants admit that the Policies indicated in Plaintiff's Statement of Undisputed Material Facts Paragraphs 1-12 were the operative policies at the Weber County Jail. Some of Plaintiff's other numbered paragraphs require specific responses. For the Court's convenience, Defendants have included Plaintiff's particular "Statement of Undisputed Material Facts" before Defendants' response:

14.     On February 27, 2016, Officer Jacobsen performed an "Intake Screening" for Mr. Jessop. See Intake Screening Form, attached hereto as Exhibit 2. In response to Question No. 3, asking if he was suicidal, Mr. Jessop circled "Y." Id. In response to Question No. 6, asking if he was taking "any psychiatric medications, Mr. Jessop circled "Y" and wrote the names: Zoma and

Keppra. Id. In response to Question No. 11, asking if he felt like he should be separated, Mr. Jessop circled "Y" and wrote from "everyone." Id. In response to Question No. 15, asking if there was "any other information that we should know that is important for your health, safety, and well-being," Id. Mr. Jessop circled "Y" and wrote that he suffered from "seizures." Id.; see also Jacobsen Depo. at 35:1-36:21; 50:7-52:20, attached hereto as Exhibit 3.

**Response to Paragraph 14:** The Intake Screening Form speaks for itself.

15.     Keppra is used to treat seizures. Mr. Jessop had a history of "being on Keppra 750mg BID in 2014 during his last incarceration." See Authorization to Treat, dated February 29, 2016, attached hereto as Exhibit 13.

**Response to Paragraph 15:** Undisputed, but Plaintiff provides no evidence that Jacobsen knew this information.

16.     In response to Question No. 16 on the Intake Screening Form, asking Officer Jacobsen if he "feel[s] this person needs to be checked by medical," Officer Jacobsen circled "N." See Intake Screening Form, attached hereto as Exhibit 2; see also Jacobsen Depo. at 50:7-52:16, attached hereto as Exhibit 3. Officer Jacobsen did not recommend that Mr. Jessop be checked by medical because he was "walking fine" and did not "seem to be hurting anywhere or anything like that." See Jacobsen Depo. at 54:3-22; 57:16-59:19, attached hereto as Exhibit 3. Because he was not checked by medical, Mr. Jessop never received his seizure medications. See id. at 60:3-64:7.

**Response to Paragraph 16:** Undisputed as to the Intake Screening form as it speaks for itself and to Officer Jacobsen's testimony. Objection that Officer Jacobsen's actions caused Mr. Jessop to not receive his seizure medication. Mr. Jessop refused to be booked, and therefore did not have a full medical assessment. It was jail policy to perform a medical assessment at booking.

See Exhibit 1, Policy 711 Medical Screening and Policy 502 Inmate Reception and Jacobsen Depo. at 109:12—110:15.

17.     In response to Question No. 16 on the Intake Screening Form, asking Officer Jacobsen if Mr. Jessop was "placed on an 8 hour watch in booking," Officer Jacobsen circled "N." See Intake Screening Form, attached hereto as Exhibit 2. As a result, the "disposition by medical" section of the Intake Screening Form was left blank, including the sections which should have been utilized to assign Mr. Jessop to "medical housing," "mental health," "suicide watch," and "mental health watch." Id. Indeed, medical personnel only filled out the medical section of the Intake Screening From after Mr. Jessop was rushed out of the jail by emergency responders to be taken to the hospital. See Medical Screening Form, attached hereto as Exhibit 13; see also Sheriff Thompson Depo. at 155:6-157:5, attached hereto as Exhibit 1.

**Response to Paragraph 17:** Plaintiff's Exhibit 13 is not the intake screening form. Exhibit 13 is an Authorization to Treat for the hospital. The Intake Screening Form speaks for itself. In addition, Mr. Jessop refused to be booked, so a medical screening could not be performed. (*See* Jacobsen Depo. 60:3-61:23; 63:17-64:7).

18.     On February 28, 2016, at approximately 3:29 a.m., Mr. Jessop began to kick the door of his cell (Cell B1), prompting Officer Heather Jensen ("Officer Jensen") to transfer Mr. Jessop to Cell B7. See Incident Report Form, dated February 28, 2016, attached hereto as Exhibit 14.

**Response to Paragraph 18:** Undisputed. The Incident Report Form speaks for itself. (*See also* Jensen Depo. 16:1-17:2).

19.     On February 28, 2016, at 3:52 a.m., Officer Jensen witnessed Mr. Jessop "[l]ying on the floor of B7 sticking his fingers up his anus and screaming." See Incident Report Form, dated February 28, 2016, attached hereto as Exhibit 15.

**Response to Paragraph 19:** Undisputed. Mr. Jessop continued sticking his fingers up his anus, even after being requested to stop by two corrections officers and a jail nurse. His screams were not screams of pain, but of pleasure. (*See* Jensen Depo. 17:13-19:20; 52:13-53:12, *and* Jacobsen Depo. 122:3-17, 123:10-21).

20.     On February 28, 2016, at 12:04 p.m., Officer Moss transferred Mr. Jessop from Cell B7 to Cell B3. See Incident Report Form, dated February 28, 2016, attached hereto as Exhibit 16. At some point thereafter, Mr. Jessop lost consciousness in his cell. See Incident Report Form, dated February 28, 2016, attached hereto as Exhibit 17.

**Response to Paragraph 20:** Officer Moss transferred Mr. Jessop from the pre-booking area into the booking area on February 28, 2016 at 12:04 p.m. However, this does not mean this was the last time Mr. Jessop was checked upon. (*See* Jacobsen Depo. 124:18-125:12; 125:21-127:24).

21.     On February 29, 2016, at approximately 11:00 a.m., Officer Moss observed Mr. Jessop lying on the floor of his cell. He called for assistance, including from Heidi Mitchell, RN. See id. There are no records of any safety checks on Mr. Jessop from February 28, 2016, at 12:04 p.m. through February 29, 2016 at 11:00 a.m. See Sherriff Thompson Depo. at 198:12-199:1, attached hereto as Exhibit 1 (officers were not regularly conducting physical checks on Mr. Jessop during his incarceration).

**Response to Paragraph 21:** Admit Corporal Moss observed Mr. Jessop lying on the floor of his cell. Deny that safety checks were not performed on Mr. Jessop during the stated time. (*See* Jacobsen Depo. 124:18-125:12). Further, Plaintiff does not cite to any evidence that Corporal Moss called out to anyone, let alone Nurse Mitchell. Sheriff Thompson did not have personal knowledge of any of the events that occurred surrounding Mr. Jessop. (Thompson Decl. ¶ 5, Doc. No. 27; *and* Thompson Depo. 208:6-14).

22.     In her report, Nurse Mitchell noted that Mr. Jessop was largely unresponsive and that he had bruising on his left wrist and arm; "purple marks;" echymoses; dried blood on his mouth; and dried blood on the floor of his cell. See Incident Report Form, dated February 28, 2016, attached hereto as Exhibit 18 (Weber0054); see also Medical Sick Calls form, dated February 29, 2016, attached hereto as Exhibit 19 (noting that "[u]pon entering cell inmate was found supine with knees bent and curled up to his side"); see also Incident Report, dated February 29, 2016, attached hereto as Exhibit 20. In response to the bruising on his hand and wrist, Nurse Mitchell noted a "report from booking staff that JESSOP had been using his hand and fist to insert into his anus and rectum repeatedly during his booking stay." See Incident Report Form, dated February 28, 2016, attached hereto as Exhibit 18. Nurse Mitchell further that "there was a strong odor akin to my memory of a GI bleed." Id.

**Response to Paragraph 22:** Nurse Mitchell's Incident Report, the Medical Sick Call entry, and Nurse Foster's Incident Report speak for themselves.

23.     On February 29, 2016, at approximately 11:06 a.m., Mr. Jessop was transported to McKay Dee Medical Center where he received emergency medical treatment. His symptoms included: rhabdomyolysis; acute kidney injury; and a gastrointestinal bleed. He further noted

evidence of reperfusion injury to his left hand, including blistering on the dorsum and palm extending into his distal forearm. In addition, Mr. Jessop exhibited bruising on his left arm and left chest. See Consultation Notes, dated February 29, 2016, attached hereto as Exhibit 21.

**Response to Paragraph 23:** Plaintiff's Exhibit 21 is only an orthopedic consult and does not reflect what was observed at the Jail previously.

25.     Sheriff Thompson's primary responsibility was to ensure the safety and welfare of the inmates. See Sheriff Thompson Depo. at 8:13-16; 20:4-10, attached hereto as Exhibit 1.

**Response to Paragraph 25:** The Sheriff has multiple responsibilities; these include ensuring safety and welfare of inmates.

26.     The WSCO policies and procedures are in place to provide for the safety and security of the inmates. Id. at 61:2-8. Sheriff Thompson was responsible for developing and implementing WSCO's policies and procedures, but never read them himself. Id. at 38:4-23; 41:10-15. He does not know if WSCO had a policy relating to the use of video cameras as the jail. Id. 32:9-22.

**Response to Paragraph 26:** The Sheriff had subordinates that he trusted to develop policies and procedures. However, the Sheriff was the sole and final policymaker for the Jail and his signature was necessary for any policy change to become official. (Thompson Decl. ¶ 3, ¶ 11). The Sheriff was not aware of any circumstances that there was a need for more or better policies, procedures, or training to eliminate the risks of providing constitutionally deficient medical services in the Jail. (Thompson Decl. ¶ 6).

27.     Sheriff Thompson knows that the failure to properly screen an inmate with a serious medical condition could place that inmate in serious harm. Id. at 57:25-58:2.

**Response to Paragraph 27:** This deposition citation is the Sheriff responding to a hypothetical question. However, the undisputed facts show that he was not aware of any deficiencies in the delivery of medical services at the Jail. (Thompson Decl. ¶ 7).

28.     Sheriff Thompson is unfamiliar with the forms to be used by his officers to log safety checks on the inmates. Id. at 76:4-16. He does not know whether officers logged safety checks on the inmates. Id. at 78:4-12. If his officers did log such safety checks, Sheriff Thompson does not know whether they did so on a computer or a paper log. Id. at 76:13-77:6. Sheriff Thompson does not know if he ever even read the policy relating to safety checks on inmates. Id. at 79:1-4. He did not train his officers regarding safety checks on inmates. Id. at 79:5-7. He does not know if his officers were required to log safety checks of inmates housed in the booking area. Id. at 80:15-17; 83: 6-14; 84:8-11. Sheriff Thompson allowed officers to disregard the WSCO's policies and procedures regarding safety checks in the booking area. Id. at 83:6-25; 85:19-25; 86:25-87:15; 89:22-25; 201:5-23. Sheriff Thompson does not know if his officers performed safety checks every 30 minutes as required by WSCO's policies and procedures. Id. at 184:25-185:8.

**Response to Paragraph 28:** This statement of facts contains multiple citations and must be unpacked sentence by sentence. However, Defendants point out that the Sheriff was not generally involved in the day-to-day operations of the Jail and did not think there was any deficiencies in the practices, policies, and training at the Jail prior to Decedent's death. (Thompson Decl. ¶ 2, ¶ 6).

Response to Sentence 1: Sheriff Thompson is familiar with the logs his officers use to document safety checks and knows officers are allowed to log those checks on either handwritten or computerized forms. (Thompson Depo. 76:4-16).

Response to Sentence 2: Sheriff Thompson does know that safety checks are logged when inmates are in the housing area. He is unsure whether 60-minute safety checks are logged when inmates are in the booking area because those inmates are under continual watch by officers in booking, so logging checks may be seen as unnecessary by his staff. (Thompson Depo. 77:18-78:12; 80:18-81:1)

Response to Sentence 3: Sheriff Thompson knew that in most housing areas, officers had daily written logs. (Thompson Depo. at 76:22-24).

Response to Sentence 4: Undisputed.

Response to Sentence 5: Sheriff Thompson ensured that officers were trained by his training staff. (Thompson Depo. 22:16-23:13).

Response to Sentence 6: Sheriff Thompson does not have personal knowledge. However, he has a Jail Commander and Sergeants under him that ensure staff is following policy and if there is an issue with policy then they bring these issues to the Sheriff and they fix them. (Thompson Depo. 87:8-15).

Response to Sentence 7: The ability of corrections staff to view all inmates in the booking area was a better practice than the policy called for. (Thompson Depo. 83:6-20; 86:5-14).

Response to Sentence 8: Sheriff Thompson does not have personal knowledge. However, he has a jail commander and sergeants under him that ensure staff is following policy and if there is an issue with policy then they bring these issues to the Sheriff and they fix them. (Thompson Depo. 38:4-23; 87:8-15; 150:23-151:3).

29.     Sheriff Thompson allowed officers to disregard WSCO's policies and procedures regarding reviewing safety check logs. Id. at 105: 22-106:7.

**Response to Paragraph 29:** Sheriff Thompson had no personal knowledge of any failure to follow policy. He relied on his Jail Commander and Sergeants to keep policy. (Thompson Depo. 102:16-22; Thompson Decl. ¶¶ 6-7).

30.     Sheriff Thompson does not know if his officers utilized medical screening forms required by the WSCO's policies and procedures. Id. at 137:5-139:25.

**Response to Paragraph 30:** Sheriff Thompson had no personal knowledge of any failure to follow policy. He relied on his Jail Commander and Sergeants to keep policy. (Thompson Depo. 102:16-22; Thompson Decl. ¶¶ 6-7).

31.     Mr. Jessop never received a medical screening as required by WSCO's own policies and procedures. Id. at 142:14-22. Sheriff Thompson was ultimately responsible for ensuring that Mr. Jessop received a medical screening within 24 hours after his arrival. Id. at 143:20-144:3. Sheriff Thompson does not know if it put Mr. Jessop at risk to not receive his medical screening. Id. at 144:4-10.

**Response to Paragraph 31:** Mr. Jessop never received a medical screening because he refused to be booked and there was nothing that suggested to Jacobsen that Mr. Jessop was experiencing a medical emergency. (Jacobsen Depo. 60:3-61:23; 63:17-64:7; Jacobsen Decl ¶ 22).

32.     Sheriff Thompson does not know if it was his responsibility to have a policy in place to ensure that inmates are able to continue on their psychiatric medications. Id. at 150:11-151:10.

**Response to Paragraph 32:** A policy existed for psychiatric medications. (See Exhibit 1, Doc. No. 27-1 at 23). Any psychiatric medications management is handled through the medical service provider with the Jail. A mental health screening is part of the booking process. Mr. Jessop

13

refused to be booked and there was nothing that suggested to Jacobsen that Mr. Jessop was experiencing a medical emergency. (Jacobsen Depo. 60:3-61:23; 63:17-64:7; Jacobsen Decl ¶ 22).

33.     Sheriff Thompson believes it is asking too much of him to be familiar with the screening and other intake forms used by his officers. Id. 151:11-152:3; 172:9-17.

**Response to Paragraph 33:** Sheriff Thompson oversaw the Sheriff's Office including general activities of the office, road operations, jail operations, court bailiffs, and community relations. He did not get involved in the daily supervision of inmates. (Thompson Decl. ¶ 3, Doc. No. 27). Sheriff Thompson had 400 employees along with hundreds of forms. (Thompson Depo. 151:13-19).

## REPLY ARGUMENT

### I.     Plaintiff does not show any basis for liability against Weber County or the Sheriff.

As explained in the opening memorandum, for liability to be shown against the County or Sheriff, Plaintiff must show (1) a Constitutionally defective policy or custom, (2) that the final policymaker who implemented the policy or custom acted with "deliberate indifference" to the constitutional rights of the plaintiff (or Decedent in this case), and (3) that the policy or custom "directly caused" and was the "moving force" behind an underlying constitutional violation that caused constitutional harm to the plaintiff. *See generally Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997).

Plaintiff is unable to show a constitutionally defective policy or custom. There is simply no pattern of unconstitutional conduct in the delivery of medical services by Jail staff prior to February 2016 that ever could have put the County or Sheriff on notice of a policy defect. Further, there is no direct causal relationship between Decedent's death and any alleged failure to follow

the Jail's policies and procedures. To hold the County and the Sheriff liable, Plaintiff cannot show merely a defect in a policy, but she must show that a constitutionally defective policy "directly caused" the injury and that the Sheriff made a "conscious choice among various alternatives to implement a policy or training which would and did cause the constitutional deprivation. *See generally City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985).

For example, there is nothing in the record to suggest that if Decedent had been placed on suicide watch or if safety logs were completed, he would not have still succumbed to death by other causes. "[J]ailers are neither obligated nor able to watch every inmate at every minute of every day." *Gaston v. Ploeger*, 297 F. App'x 738, 743 (10th Cir. 2008). Decedent was in the booking area, which is the highest trafficked area of the Jail, and no evidence suggests that he was not being visually observed on a regular basis, or that there is any direct causal relationship between the attention he received at the Jail and his death. The undisputed material facts show that Jacobsen did not perceive Decedent to be experiencing any medical emergency, but only that Decedent was drunk and belligerent. (Jacobsen Decl. ¶¶ 12-20).

### A.   The undisputed facts show that there were no known deficiencies in the delivery of medical services.

Plaintiff argues that lack of training in this instance is enough to incur liability against the County and Sheriff. However, the undisputed facts show there are no grounds to find liability against either Defendant for inadequate training. Persistent practices may amount to policy within a municipality, but they must be "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 60 (2011). "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Id.* Plaintiff must show that the Sheriff made a conscious choice between readily available alternatives and

15

"deliberately chose a [policy, practice, or] training which would prove inadequate." *City of Oklahoma v. Tuttle*, 471 U.S. 808, 824 (1985). Plaintiff must also show more than a mere single instance of unconstitutional activity, unless the policy itself is inherently unconstitutional. *Id. See also Connick v. Thompson*, 563 U.S. 51, 62 (2011) (where four prior instances of unconstitutional activity was insufficient to put the final policymaker on notice that the training was inadequate). This means that the mere fact that Decedent died is insufficient to show a county-wide policy and if 3 or 4 other inmates had died prior to Decedent, it would still be insufficient to show a pattern of unconstitutional activity.

The undisputed material facts show that all deputies at the Jail received training. The Sheriff had lieutenants that were specifically tasked with training. (Thompson Depo. 22:16-24:24). They would make sure that there was training on all parts of policy and procedure. (Thompson Depo. 70:2-7). Intake training was something almost all staff received. (Thompson Depo. 131:23-132:5). The Sheriff was ultimately in charge of training and there were near daily training briefs. (Thompson Depo. 41:16-42:7). Further, there are statutory training requirements to even be a correctional officer at the Jail. *See* Utah Code Ann. § 53-13-104(1)(a). To even be a correctional officer an individual had to be "recognized and accepted by the [Peace Officer Standards and Training] division as having successfully met and maintained the standards and training requirements set and approved . . . ." Utah Code Ann. § 53-13-101(2) (underlining added).

Moreover, Plaintiff repeatedly admits that there was a medical policy at the Jail. Nevertheless, Plaintiff does not claim that the policy itself was defective and does not show that the Sheriff acted with deliberate indifference in implementing the policy. Even if Plaintiff were

16

able to show one or two instances of delayed medical care, this is insufficient as a matter of law to establish a pattern on unconstitutional conduct. *Tuttle*, 471 U.S. at 824.

Plaintiff cites *City of Canton v. Harris*, 489 U.S. 378, 390 n.10 (1989) to argue that this suit is the rare instance where failure to train could lead to constitutional liability. (Doc. No. 32 at 19). However, the scenario envisioned in *Canton* is only in a footnote and just a hypothetical. The scenario imagined in *Canton* is so outrageous that it is easily distinguishable from the current matter. When a law enforcement agency trains a police officer to use a firearm, it is beyond certain that somebody from that law enforcement agency will eventually have to fire his/her weapon. However, there is no such guarantee that keeping safety logs will ever successfully prevent a death like Decedent's in the Jail. This is particularly true when the Sheriff was not aware of any deficiencies in the delivery of medical services at the Jail. In the *Canton* example, the officer is quite literally going to pull the trigger to harm somebody, so it stands to reason rigorous training in firearms use is necessary. This certainty does not exist for a Jail that had never had never experienced the medical problem posed by Decedent and were not put on notice that further training was necessary to prevent the harm suffered by Jessop. Therefore, the *Canton* footnote is not applicable in this instance.

Moreover, even if the medical services delivery was somehow deficient (which it was not), Plaintiff has not shown that it was implemented with deliberate indifference, or that there is a direct causal link to the training and Decedent's death. *See generally Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397 (1997). That is, there was no training that actively encouraged deputies to ignore inmates' serious medical needs, and therefore, no liability can attach to the County or Sheriff.

**B.      Weber County Jail's policies were not unconstitutional.**

Plaintiff's opposition recognizes that Weber County had policies and procedures but alleges that they were not being strictly followed. (Doc. No. 32 at 19-20). However, "a failure to adhere to administrative regulations does not equate to a constitutional violation." *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993). Plaintiff actually undercuts her argument by acknowledging the Jail policies' existence. Even if a line officer violates policy, this is insufficient as a matter of law to incur liability against the County and Sheriff. Plaintiff does not identify any defect in the policy itself because it is on its face a perfectly valid policy devoid of any constitutional defects. These policies had functioned properly for years beforehand as evidenced by the facts that the Sheriff did not know of any defects in the delivery of medical services to inmates. (Thompson Decl. ¶ 10). Therefore, there is no basis for County or Sheriff liability in this case.

**II.      There is no basis for constitutional liability against Jacobsen.**

Plaintiff briefly mentions that Jacobsen is also liable because Jacobsen wrote on the Intake Screening Form that Decedent did not need to be examined by medical staff. (Doc. No. 32 at 23). This single sentence is the entirety of Plaintiff's argument for why liability exists for Plaintiff. As argued in the opening motion, Jacobsen had no reason to believe that Decedent needed medical attention. Decedent was simply loud and boisterous, consistent behavior for someone who was intoxicated. (Jacobsen Decl. ¶¶ 11-23). An official is not responsible to take action to protect against an unknown risk. *See generally Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The undisputed material facts show that Jacobsen thought that nothing was wrong with Decedent, and

as such, he was not deliberately indifferent and did not violate Decedent's constitutional rights. In fact, Jessop's ailments, whatever they were, were rare and not known to any of the Jail staff.

**III.     The caselaw is clear that the Sheriff and Jacobsen are shielded by qualified immunity.**

Finally, Plaintiff has not identified any caselaw that would show Defendants are not entitled to qualified immunity. Qualified immunity shields an officer from suit "when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Saucier v. Katz*, 533 U.S. 194, 206 (2001). It is further important to emphasize that the inquiry must be made in light of the specific context of the case and not as a broad proposition. *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). The inquiry is the more "particularized" acts of the defendants in the case at hand. *Id*. at 199.

Plaintiff does not identify or cite any case where defendants were in a similar posture to Defendants in this case. Instead she simply claims inmates have a constitutional right to "safety checks and medical treatment," or to adequate medical care. (Doc. No. 32 at 24). However, no appellate cases support this overly generalized proposition. Due to the lack of case law in support of her position, Plaintiff defines this right at such a high level of generality that practically any dissatisfaction with the medical care received while incarcerated would qualify as a constitutional violation. This is clearly not the law. None of the Sheriff's or Jacobsen's actions were contrary to clearly established law.

Jacobsen's actions were limited to conducting the pre-booking process with Decedent. Decedent, while initially cooperative, became unruly and the full booking process could not be completed. (Jacobsen Decl. ¶¶ 12-14). However, Jacobsen did not observe anything that led him to believe Decedent was experiencing any sort of medical emergency while in the Jail. (Jacobsen

Decl. ¶ 22). This is insufficient to show any theory under which Jacobsen violated Decedent's constitutional rights and so he is entitled to qualified immunity. Similarly, the Sheriff had no notice of any defective policies, procedures, or training at the Jail, and so he is also entitled to qualified immunity. (Thompson Decl. ¶¶ 6-7).

Plaintiff also makes a passing comment that the Sheriff and Jacobsen are not entitled to qualified immunity because they did not assert it at the outset of this litigation. This argument is also without merit. Assessing qualified immunity can be a fact intensive analysis and so it is appropriate to raise in a summary judgment motion. Regardless, they asserted qualified as an affirmative defense in their answer, so Plaintiff has been on notice about this defense from the outset. (*See* Doc. No. 8 at 7). In short, Plaintiff has not shown that the Sheriff and Jacobsen are not entitled to qualified immunity, and so they should be dismissed from this suit for that reason alone.

**WHEREFORE:** This Court should set a time for a hearing and enter summary judgment in favor of Defendants and against Plaintiff and dismiss all of Plaintiff's claims with prejudice.

Dated this 28th day of August, 2019.

*/s/ Frank D. Mylar*

_____
Frank D. Mylar
Attorney for Defendants