IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| MICHELLE SHAFER, on behalf of ESTATE OF ASHLEY EVAN JESSOP,<br><br>Plaintiff,<br><br>vs.<br><br>WEBER COUNTY ET AL.,<br><br>Defendants. | **MEMORANDUM DECISION AND ORDER GRANTING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:18-CV-20 RJS<br><br>Chief District Judge Robert J. Shelby |

Represented by counsel, Plaintiff Michelle Shafer sues on behalf of her son, former pretrial detainee, decedent Ashley Evan Jessop. (ECF Nos. 2; 32-1, at 112.) The civil complaint, filed under 42 U.S.C.S. § 1983 (2020), requests damages. (ECF No. 2, at 4, 21.)

## I. BACKGROUND

• 2/5/18 - Complaint filed, alleging civil claims against Ogden City and Weber County defendants. (ECF No. 2, at 2-3.)

• 4/2/19 - Order granting stipulated motion to dismiss Ogden City defendants. (ECF No. 25.)

• 6/17/19 - Weber County defendants' summary-judgment motion, supported by declarations, policy manual excerpts, and jail records. (ECF Nos. 26-28.)

• 7/31/19 - Plaintiff's summary-judgment opposition, dropping one defendant (Weber County Sheriff's Office) and three claims (i.e., based on federal disability act, survivorship, and state constitution). (ECF No. 32.) Opposition supported by deposition transcripts, government records, and policy manual excerpts. (ECF No. 32-1.)

• 8/28/19 - Defendants' reply, with attached depositions, to Plaintiff's opposition. (ECF No. 35.)

Remaining defendants are Weber County, Weber County Sheriff Thompson (individual capacity), and Weber County Deputy Jacobsen (individual capacity). (ECF No. 2, at 2-3.)

Plaintiff asserts these claims under the Federal Constitution: (a) inadequate medical treatment (Thompson and Jacobsen), (*id*. at 9-12); (b) failure to adequately train and supervise employees (Thompson), (*id*. at 15-16); (c) illegal Weber County policies, (*id*. at 16-18).

The court now considers Defendants' summary-judgment motion on these remaining claims.

## II. SUMMARY JUDGMENT

An important word at this section's start: defendants are not to be lumped together as a group, but should be treated as individuals, each with the defendant's own claim(s) against the defendant, based on the defendant's own behavior. *See Pahls v. Thomas*, 718 F.3d 1210, 1225 (10th Cir. 2013) (stating, because § 1983 is "vehicle[] for imposing personal liability on government officials, we have stressed the need for careful attention to particulars, especially in lawsuits involving multiple defendants"); *Robbins v. Okla. ex rel. Dept' of Human Servs.*, 519 F.3d 1242, 1250 (10th Cir. 2008) (stating complaint must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him . . . as distinguished from collective allegations") (emphasis in original) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 565 n.10 (2007)); *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 532-33 (10th Cir. 1998) (holding district court's analysis of plaintiff's § 1983 claims "infirm" when district court "lump[ed]" together plaintiff's claims against multiple defendants--"despite the fact that each of the defendants had different powers and duties and took different actions with respect to [plaintiff]"--and "wholly failed to identify specific actions taken by particular defendants that could form the basis of [a constitutional] claim").

That said, this Court shall grant summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party may support factual assertions by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." *Id*. at 56(c)(1). Summary judgment's purpose "is to isolate and dispose of factually unsupported claims or defenses." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986).

The movant has the "initial burden to demonstrate an absence of evidence to support an essential element of the non-movant's case." *Johnson v. City of Bountiful*, 996 F. Supp. 1100, 1102 (D. Utah 1998). Once movant meets this burden, it "then shifts to the non-movant to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of that element." *Id*. To do so, the non-movant must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal-Mart Stores*, 144 F.3d 664, 671 (10th Cir. 1999) (citation omitted). In a summary-judgment motion ruling, this court must "examine the factual record and reasonable inferences therefrom in the light most favorable to the party opposing the motion." *Sealock v. Colorado*, 218 F.3d 1205, 1209 (10th Cir. 2000).

### A. UNDISPUTED MATERIAL FACTS

The undisputed material facts are drawn from the parties' admissible evidentiary submissions in support of their summary-judgment arguments.

• Plaintiff is decedent's mother and personal representative of his estate. (ECF No. 32-1, at 112.)

• **Defendant Weber County**, political subdivision of State of Utah, operates Weber County Correctional Facility (WCCF). (Thompson Decl., ECF 27, at 1.)

• At the relevant time, **Defendant Thompson** was Weber County sheriff, with responsibilities including policy making for and general oversight of WCCF, but not "daily supervision of inmates." (ECF No. 27, at 1-2.) Thompson was "ultimately responsible for insuring that Weber County officers received training regarding the policies and procedures for [WCCF] at the time of [decedent's] incarceration." (Thompson Dep., ECF No. 32-1, at 6.) Thompson never met decedent and was not aware of him while held at WCCF. (ECF No. 27, at 2.)

• At the relevant time, **Defendant Jacobsen** was Weber County deputy. (Jacobsen Decl., ECF No. 28, at 1.) As deputy, he did "routine bookings, delivered food, completed inmate counts, and performed other routine jail duties." (ECF No. 28, at 1.)

• At the relevant time: "All Jail staff had the ability to call the nurses, a Physician Assistant, and/or a Doctor if they had any concerns about an inmate's medical needs or care." (ECF No. 27, at 2.) Inmates held in intake were "readily viewable from the staff location [or seating area] . . . directly on a continual [ongoing] basis." (ECF No. 32-1, at 15, 17-18.) In intake, inmates were "under continual observation." (*Id*. at 20.) "[M]edical screening takes place as the deputy prepares their prebooking." (ECF No. 32-1, at 27.) "Each individual entering the facility has a medical screening from the deputy that's booking them in." (*Id*.) "[M]edical director and . . . physician in cooperation with . . . jail commander" were responsible "to ensure [decedent] received a medical screening within his first 24 hours at the facility." (*Id*.)

• At the relevant time, WCCF policy stated: "The Weber County Sheriff's Office has a legal and methodical process for the reception of arrestees into this facility. This policy established guidelines for . . . identification of medical/mental health issues . . . ." (Weber County Sheriff's Office Custody Servs. Manual 502.1 (adopted 11/30/15)). "All arrestees shall be screened prior to booking to ensure the arrestee is medically acceptable for admission . . . . Required paperwork may include . . . [a]commodation requests related to disabilities [and i]nformation regarding suicidal statements or actions." *Id*. at 502.3(g). "The admission process should include an attempt to gather a comprehensive record of each arrestee, including . . . [m]edical, dental and mental health screening records, including suicide risk . . . ." *Id*. at 502.5 "Those who will not be placed into general population include . . . [a]rrestees who are intoxicated . . . ." *Id*. at 502.6. "Staff shall respond promptly to medical symptoms presented by inmates to lessen the risk of a life-threatening emergency and to promote the safety and security of all persons in the facility." *Id*. at 502.6.2. "It is the policy of this office to properly classify inmates according to security and health risks so that appropriate supervision, temporary holding and housing assignments may be made." *Id*. at 507.2.

> The initial classification process is intended to identify . . . at-risk inmates. It should occur early in the intake process to allow for appropriate supervision while an inmate is being temporarily held in this facility . . . . Inmates should be interviewed by an intake deputy as soon as possible in the booking process. The intake

> deputy shall complete the initial classification form. The initial
> classification form should include a place for the intake deputy to
> make a housing recommendation. This recommendation should be
> based on the initial classification form, an assessment of the
> inmate's condition and the inmate's interview.

*Id*. at 507.4

> It is the policy of this office that a medical screening be performed
> on all inmates upon arrival at the intake area to ensure that
> existing, emergent and urgent health care . . . or mental health
> needs are identified, risks are assessed and inmates . . . are properly
> classified and housed for their health . . . .

*Id*. at 711.2. "[M]edical screening shall be performed by qualified health care professionals or health-trained correctional staff. . . . All inmates shall complete a medical screening as part of the booking process. . . . The forms should be completed no later than 24 hours after the arrival of an inmate . . . ." *Id*. at 711.3.

> [M]edical screening inquiry should . . . document . . . [m]ental
> illness . . .[and h]istory of or current suicidal ideation . . . . Should
> the medical screening identify a need for a more comprehensive
> medical assessment of the inmate, a qualified health care
> professional should initiate appropriate follow-up action . . . .

*Id*. at 711.3.1. "The staff member completing the medical screening shall document . . . observations . . . [of g]eneral appearance [and] behavior[; s]tate of consciousness . . .[; a]bility to physically function; . . . [and a]ny other observable health symptoms." *Id*. at 711.3.2. "Written documentation of the medical screening should include the name of the screener, the date and time and . . . [i]mmediate or scheduled referral to a medical . . . or mental health professional . . . [and t]he inmate's responses to questions asked by the interviewer." *Id*. at 711.3.3.

> Persons who are brought to the facility who are obviously in need
> of immediate medical attention shall be referred to a medical
> facility room for a medical clearance. Medical conditions that
> require a medical clearance include, but are not limited to . . .
> [i]ntoxication to a degree that the individual cannot speak
> coherently or stand or walk unaided . . . [; a]ctively suicidal[; a]ny
> other medical condition, which, in the opinion of the booking
> personnel, should be urgently referred for evaluation by medically
> trained personnel. Inmates with these medical conditions are not
> suitable for admission to the facility until medically cleared by a
> qualified health care professional.

*Id*. at 711.4. "It is the policy of this office that a range of mental health services shall be available for any inmate who requires them." *Id*. at 712.2. "Inmates may be referred to a qualified health care professional through a variety of methods, which include the medical screening process, the mental health appraisal process and self-referral or staff referral. Qualified health care professionals should respond to all referrals in a timely manner and initiate the appropriate treatment services." *Id*. at 712.4. "It is the policy of this office that all individuals booked into the

5

facility shall receive an initial mental health screening by a qualified mental health professional, qualified mental health staff or health trained custody staff." *Id*. at 713.2.

> The initial screening is designed to identify whether mental health conditions exist that require immediate or ongoing intervention. The screening . . . should include . . . [i]nquiry into whether the inmate is or has . . . [t]houghts or history of suicidal behavior[; b]een prescribed or is taking any psychotropic medication or antidepressants[; b]een treated for mental health issues[; a] history of psychiatric treatment[; a] history of substance abuse or been treated for substance abuse[; and] . . . observations of . . . [a]ppearance and behavior . . . .

*Id*. at 713.3.

• **2/27/16** - At 7PM, **Defendant Jacobsen**'s shift started. (ECF No. 28, at 2.) Decedent was arrested by Ogden Police Department for public intoxication and transported to WCCF. (*Id*. at 2; 32-1, at 104.) At 8:20PM, Jacobsen did intake screening of decedent. (ECF No. 28, at 2.) "As part of the pre-booking process, [Jacobsen] asked Decedent a series of questions on the Intake Screening questionnaire." (ECF No. 28, at 2.) The Intake Screening form shows decedent's answers to questions, in Jacobsen's writing, (Jacobsen Dep., ECF No. 32-1, at 46), as follows: Decedent indicates he had not "been in involved in an accident or fight during the last 24 hours"; did not "expect to have withdrawals while at the jail"; was "all most" [sic] "suicidal"; had not "attempted suicide in the past"; was not "being treated by a psychiatrist or mental health counselor"; was "taking . . . psychiatric medications" and did not "have any illnesses, or other conditions requiring medication"; and felt he "should be separated from . . . everyone." (ECF No. 28-1.) "[M]edical [staff] would see . . . notes when they spoke with [decedent] later . . . [a]nd they would also ask questions about any kind of medication he might be on." (ECF No. 32-1, at 55.) Decedent's oral answer to question of whether he was suicidal was, "Almost." (ECF No. 32-1, at 47.) Jacobsen then asked "follow-up questions" not shown on Intake Screening form--e.g., "Do you have any means, methods or reasons why you want to do this?" (*Id*.; ECF No. 32-1, at 53.) Intake Screening form shows Jacobsen's name and his answers that he did not feel decedent "needs to be checked by medical," nor did he place decedent "on an 8 hour watch in booking." (ECF No. 28-1.) Based on observation that decedent "appeared to be walking fine" and "didn't seem to be hurting anywhere or anything like that," Jacobsen saw "no reason to have medical check him out at the time." (ECF No. 32-1, at 51.) Jacobsen considered mental health as part of evaluation when deciding whether decedent needed medical check. (*Id*. at 51.) Based on "booking questions" that "get a little bit more in-depth" and "after talking with [decedent]," Jacobsen "did not see any reason to put him on an eight-hour watch while [personnel] were going to be watching him come off of alcohol or drugs or whatever he was on at the time." (*Id*. at 49.) In making this decision, Jacobsen considered decedent's "response and his attitude," with "attitude" meaning decedent was "cooperative, . . . willing to answer the questions . . . [and] talk to [Jacobsen]." (*Id*. at 53.) Jacobsen said that decedent "never showed me any signs of wanting to hurt himself," but "was more frustrated about being arrested." (*Id*. at 57.) At the time of pre-booking, Decedent was cooperative. [Jacobsen] did not see any indication . . . that Decedent was in any type of medical emergency. [Jacobsen] did not refer [decedent] to medical because there

was no medically necessary reason to refer him." (ECF No. 28, at 2.) Jacobsen's "understanding" was "that at some point during this booking process, medical would have independently seen [decedent] as just part of the normal process" and ask him "questions regarding whether or not he was suicidal." (ECF No. 32-1, at 56.) "Following the pre-booking intake screening, [decedent] was moved into a cell in the booking area where he could be observed until he became sober enough to answer the more in-depth booking questions." (ECF No. 28, at 3.) "During his time in booking, [decedent] became unruly and uncooperative. He would kick the plexiglass, and shout while housed in a booking cell," which "disrupt[ed] booking of other arrestees." (*Id*. at 3.) Due to unruly behavior, [decedent] was moved from booking into a pre-booking cell. Pre-booking is also viewable from the booking area, but there is an additional wall of plexiglass that can diminish the disruptiveness of an unruly inmate." (*Id*.) Decedent "almost immediately pulled down his pants and started inserting his fingers in his anus" and "scream[ing]," refusing to stop when asked. (*Id*.) Jacobsen "determined that [decedent] was not causing harm to himself." (*Id*.) "At some point while [decedent] was continuing this behavior, a jail nurse attempted to speak with him." (*Id*.)

• 2/28/16 - At 3:39AM, in response to decedent kicking his cell door, Officer Jensen moved him to another cell. (ECF No. 28-2.) At 3:52AM, Jensen saw decedent lying on the floor, with "his fingers up his anus and screaming." (ECF No 28-3.) At 7AM, **Defendant Jacobsen**'s shift ended, with decedent still sticking his fingers in his anus and screaming. (ECF No. 28, at 2-3.) At 10AM and 11:47AM, Officer Moss gave decedent water. (ECF No. 32-1, at 117-18.) At 12:33PM, Officer Moss moved decedent to another cell, where he lost consciousness and fell to the ground. (ECF No. 32-1, at 119.) At 7PM, Jacobsen started his next shift and observed decedent "had been moved back into a booking cell," "laying on the bench inside the cell," but "had still not been booked into the jail because of his uncooperative behavior." (ECF No. 28, at 3-4.) Decedent "declined" Jacobsen's request to "get through the booking process." (*Id*. at 4.) Jacobsen did not see decedent "exhibit anything that would indicate a medical emergency." (*Id*.)

• 2/29/16 - At 7AM, **Defendant Jacobsen**'s shift ended without him seeing decedent "exhibit anything that would indicate a medical emergency." (*Id*.) Just before Jacobsen's shift ended, he "told [decedent] that he had video court that he needed to go attend" and decedent responded "with profanities to [Jacobsen] and to the court and refused to go." (*Id*.) Jacobsen did not see decedent again. (*Id*.) At 11AM, Nurse Mitchell became aware of [decedent] "lying on the floor of the cell." (Patient Note, ECF No. 32-1, at 123.) Mitchell noted that in cell "there was a strong odor akin to . . . a GI bleed." (*Id*.) At 11:04AM, Mitchell "began treatment for shock" and applied oxygen. (*Id*.) At 11:05AM, Officer Moss reported decedent "unresponsive," "laying on his stomach on the floor." (WCSO rep't, ECF No. 32-1, at 122.) Also at 11:05AM, Officer West reported, "[M]edical staff was asked by Sgt. Johnson to assess [decedent]." (WCSO Supp Rep't, ECF No. 32-1, at 121.)

> LPN Foster along with Corp. Moss and [West] entered cell B3 and LPN Foster asked if [decedent] could be sat up from the laying position that [decedent] was on the floor. [West] and Corp. Moss lifted [decedent] from the floor where [West] observed a small amount of blood that appeared to have come from [decedent's]

7

mouth on the floor. LPN Foster and other medical staff started to
				take vital signs of [decedent] and advised . . . that EMS needed to
				be activated.

(ECF No. 32-1, at 121, 125.) At 11:15AM, West "called to central control over . . . handheld radio and told central to activate EMS." (*Id*.) At 11:21AM, "EMS arrived . . . and took over treatment for [decedent] and transported [decedent] to the hospital." (*Id*.) At 11:40AM, Intake Screening form was signed by "Medical Staff" member." (ECF No. 28-1.) At 11:46AM, Moss reported, "[Decedent] was checked on by medical staff, EMS was activated." (ECF No. 32-1, at 120.) Decedent admitted to hospital, where these issues were noted: metabolic encephalopathy, rhabdomyolysis, kidney injury, end-stage liver disease, seizures, gastrointestinal bleed, alcohol dependence with withdrawal, and left side bruising and injuries. (Physician Consultation Notes, ECF No. 32-1, at 146.)

• **3/2/16** - Decedent discharged from hospital. (*Id*.)

• **3/3/16** - Decedent died. (*Id*.; ECF No. 32-1, at 112.)

• **3/7/16** - Cause of death certified as "Hepatorenal Syndrome Due to (or as a consequence of) Rhabdemyolysis." (Cert. of Death, ECF No. 32-1, at 148.)

## B. CLAIMS AGAINST INDIVIDUAL DEFENDANTS

Plaintiff alleges that decedent's injuries were caused by Defendants Jacobsen and Thompson providing inadequate medical treatment and Thompson not properly training and supervising his staff. (*Id*. at 9-16.)

Based on qualified immunity, individual defendants Thompson and Jacobsen move for summary judgment on remaining claims against them.

> "The doctrine of qualified immunity protects government
> officials 'from liability for civil damages insofar as their conduct
> does not violate clearly established statutory or constitutional
> rights of which a reasonable person would have known.'" *Pearson
> v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v.
> Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified immunity
> balances two important interests--[1] the need to hold public
> officials accountable when they exercise power irresponsibly and
> [2] the need to shield officials from harassment, distraction, and
> liability when they perform their duties reasonably." *Id.* The
> purpose of the doctrine is to provide government officials
> "breathing room to make reasonable but mistaken judgments about

> open legal questions." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).
> "Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted). When a defendant raises the qualified immunity defense, the plaintiff must therefore establish (1) the defendant violated a federal statutory or constitutional right and (2) the right was clearly established at the time of the defendant's conduct. *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). Under this two-part test, "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 138 S. Ct. at 1152 (quoting *White v. Pauly*, 137 S. Ct. 548, 551 (2017)).

*Ullery v. Bradley*, 949 F.3d 1282, 1289 (10th Cir. 2020).

> The test imposes a "heavy two-part burden." *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007) (internal quotation marks omitted). If the plaintiff fails to satisfy either part of the two-part inquiry, a court must grant the defendant qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The court has discretion to decide which of the two prongs of the qualified immunity analysis to address first. *See Pearson*, 555 U.S. at 236. "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment...." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted).

*Grissom v. Roberts*, 902 F.3d 1162, 1167 (10th Cir. 2018); *see also Watson v. Univ. of Utah Med. Ctr.*, 75 F.3d 569, 577 (10th Cir. 1996) ("Only if plaintiff makes that threshold showing does the burden shift to defendants to show that no material facts remain in dispute that would defeat defendant's claim of qualified immunity.") (citing *Jantz v. Muci*, 976 F.2d 623, 627 (10th Cir. 1992)).

Regarding claims against these individual defendants, the court focuses on prong one of the qualified-immunity analysis--the violation of decedent's federal constitutional rights--

9

concluding Plaintiff has not established this prong and therefore has not carried her burden on summary judgment.

### 1. INADEQUATE MEDICAL TREATMENT

Because decedent was a pretrial detainee, the inadequate-medical-treatment claim derives directly from the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment's prohibition on cruel and unusual punishment. *Randall v. Bd. of County Comm'rs*, 184 F. App'x 723, 726 (10th Cir. June 13, 2006) (unpublished). As this court has previously recognized, however, the analysis is the same:

> Under the Fourteenth Amendment's due process clause, pretrial detainees . . . are entitled to the same degree of protection regarding medical attention as that afforded convicted inmates under the Eighth Amendment. Thus, [a pretrial detainee's] inadequate medical attention claim must be judged against the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).

*Frohmader v. Wayne*, 958 F.2d 1024, 1028 (10th Cir. 1992) (citation omitted).

This standard is hard to meet, as "'[d]eliberate indifference[]' . . . requir[es] a higher degree of fault than negligence, or even gross negligence." *Barrie v. Grand County*, 119 F.3d 862, 869 (10th Cir. 1997) (quotation omitted); *see also Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). The Tenth Circuit has specified the standard as follows: "[A]n official . . . acts with deliberate indifference if its conduct . . . disregards a known or obvious risk that is very likely to result in the violation of a prisoner's constitutional rights." *Barrie*, 119 F.3d at 869 (quotation omitted). To meet this standard, Plaintiff must "present evidence of the prison official's culpable state of

mind," which requires showing that "the official [knew] of and disregard[ed] an excessive risk to inmate health or safety." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005) (quotation omitted).

To prevail, Plaintiff must "show that prison officials were consciously aware that the prisoner faced a substantial risk of harm and wantonly disregarded the risk "by failing to take reasonable measures to abate it." *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). And a plaintiff "who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation." *Perkins v. Kan. Dep't of Corrs.,* 165 F.3d 803, 811 10th Cir. 1999); *see also Gee v. Pacheco*, 627 F.3d 1178, 1192 (10th Cir. 2010) ("Disagreement with a doctor's particular method of treatment, without more, does not rise to the level of a[ constitutional] violation.").

Moreover, an officer "who serves solely as a gatekeeper for other medical professionals capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Delayed care constitutes a constitutional violation only if the delay was caused by deliberate indifference and resulted in "substantial harm," which means "'lifelong handicap, permanent loss, or considerable pain.'" *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)); *Olson v. Stotts,* 9 F.3d 1475, 1477 (10th Cir. 1993). "[I]n the context of a missed diagnosis or delayed referral, there must be direct or circumstantial evidence that 'the need for additional treatment or referral to a medical specialist is obvious,'" and "'where a doctor merely exercises his considered medical judgment,'" no deliberate indifference exists. *Sparks v. Singh*, 690 F. App'x 598, 604 (10th Cir. 2017) (unpublished) (quoting *Self v. Crum*, 439 F.3d 1227, 1231-32 (10th Cir. 2006)).

11

Again, Thompson and Jacobsen assert qualified immunity as a barrier to liability here. This shifts the burden to Plaintiff to show that Thompson and Jacobsen violated decedent's constitutional rights. *Lundstrom v. Romero*, 616 F.3d 1108, 1118-19 (10th Cir. 1012). To avert summary judgment, Plaintiff argues each defendant violated decedent's federal constitutional right to adequate medical care.

### a. THOMPSON

"Individual liability under § 1983 must be based on personal involvement in the alleged constitutional violation." *Foote v. Spiegel*, 118 F.3d 1416, 1423 (10th Cir. 1997). "[A] supervisor cannot be held liable under § 1983 on a *respondeat superior* theory." *Bewley v. City of Duncan*, Nos. 97-6274, 97-6321, 1998 U.S. App. LEXIS 11737, at *17-18 (10th Cir. 1998) (unpublished) (citing *Brown v. Reardon*, 770 F.2d 896, 901 (10th Cir. 1985)).

As corroborated in the section, "Undisputed Material Facts," the court has reviewed hundreds of pages of evidentiary materials provided by the parties and found not one instance of Defendant Thompson personally involved in decedent's medical treatment. Thompson did not even know decedent was held at WCCF while he was there.

In sum, Thompson's lack of personal involvement defeats Plaintiff's individual claim against him for inadequate medical treatment. Summary judgment is granted for Thompson on the inadequate-medical-treatment claim.

### b. JACOBSEN

Plaintiff's allegations specific to Jacobsen regard his "knowing failure to follow policies, rules or directives that set-in motion a series of events by others which he knew or reasonably should have known would result in constitutional injuries to [decedent]," (ECF No. 2, at 3); and,

12

after screening decedent, his failure to put decedent "in medical housing," on suicide or mental-health watch, and on a mental-health referral, (*id*. at 5.) In other words, Plaintiff argues, if Jacobsen had followed policy, he would have gotten decedent medical or mental-health help after hearing decedent's answers to the intake questions; his failure to do so results in this inadequate-medical-treatment claim.

First, Plaintiff inappropriately uses terms like "reasonably should have known," which equates to negligence principles that are inapplicable here. *Barrie*, 119 F.3d at 869 (10th Cir. 1997) ("'Deliberate indifference[]' . . . requir[es] a higher degree of fault than negligence, or even gross negligence." (quotation omitted)); *Estelle,* 429 U.S. at 106 ("Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."). Jacobsen may not be held liable here for (allegedly) negligently ignoring policy and signs that he should enlist the help of a medical or mental-health professional.

Jacobsen could instead only be liable if he acted with deliberate indifference--consciously aware that decedent faced a substantial risk of harm and wantonly disregarding that risk "by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

It is undisputed that Jacobsen was not a medical professional and functioned as a gatekeeper who only monitored and documented information to pass along to medical professionals for application of their advanced education and experience. There is no hint that Jacobsen had conscious awareness that decedent was at substantial risk of harm. His unassailed account of his pre-booking interactions with decedent shows him diligently completing the intake-screening form, by questioning decedent and recording the answers. But his screening was not rote; he followed up on points of potential concern. For instance, upon hearing decedent say

he was "almost" suicidal, he probed for more context, before ruling out the need to formalize "a watch" or referral. He explained his thought process--e.g., because he knew decedent would be kept in a highly visible intake cell while decedent's intoxication subsided, he recognized that there would be constant observation just in case it was needed. He also explained that he knew he did not stand in final judgment as to decedent's health risks: he understood policy dictated that medical professionals would see his intake-screening form and pursue any angles that made sense based on their expertise. During Jacobsen's two twelve-hour shifts with decedent, decedent interacted with Jacobsen. There were other jail personnel also interacting with decedent, including a nurse. At no point would Jacobsen have been expected to see himself as a primary player in decedent's health treatment. He served a preliminary screening function only. During decedent's whole (nearly) forty hours at WCCF, other WCCF personnel, including a nurse, were around decedent in his easily observable location.

"A prison [worker] who serves solely as a gatekeeper for other medical professionals capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). Here, though, the undisputed evidence shows that Jacobsen fulfilled his gatekeeper role promptly, when he interviewed decedent and recorded his answers on the required form. But then, Jacobsen dug below the surface of the form, so he could reassure himself that decedent was not in a position to imminently harm himself. His declaration and deposition statements show he applied judgment and experience to assess decedent's risks vis-à-vis the jail environment.

So Jacobsen adequately fulfilled his gatekeeper role: after conscientiously screening decedent in the pre-booking process, Jacobsen noted decedent's psychiatric medications and

14

possible (but not imminent) suicidal thoughts, relying on policy and experience that professionals would provide any needed follow-up. "The available evidence fails to support a reasonable inference that Defendant [Jacobsen] knew that a doctor's care was more urgently needed and that []he recklessly disregarded such a need." *Winrow v. Stell*, No. CIV-13-1144-D, 2015 U.S. Dist. LEXIS 75710, at *89-92 (W.D. Okla. March 5, 2015) (R. & R.), *adopted by* 2015 U.S. Dist. LEXIS 74945 (June 10, 2015). As such, Jacobsen's actions "cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Estelle*, 429 U.S. at 105. Plaintiff has not shown that Jacobsen "intentionally withheld medical treatment in order to inflict pain or harm upon [decedent]." *Narduzzi v. Smith*, No. 1:14cv-1349, 2015 U.S. Dist. LEXIS 128390, at *14 (M.D. Pa. Sept. 24, 2015); *see Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Jacobsen is thus entitled to qualified immunity and granted summary judgment. Jacobsen is dismissed from this case.

### 2. FAILURE TO TRAIN AND SUPERVISE

Plaintiff alleges supervisory-liability claims against Thompson for failure to train and supervise WCCF staff, thus setting the stage for decedent's health deterioration. But Thompson "'cannot be held liable in his individual capacity for implementing [WCCF] policies or for the actions of [employees] under a theory of supervisory liability, when there was no violation of [decedent's] constitutional rights.'" *Turner v. Okla. Cty. Bd. Of Comm'rs*, No. 19-6092, 2020 U.S. App. LEXIS 6456, at *9 (10th Cir. Mar. 2, 2020) (unpublished) (quoting *Martinez v. Beggs*, 563 F.3d 1082, 1092 (10th Cir. 2009)); *Fogarty v. Gallegos*, 523 F.3d 1147, 1162 (10th Cir. 2008) (explaining supervisory liability requires constitutional deprivation affirmatively linked to

supervisor's personal participation); *accord Burke v. Regalado*, 935 F.3d 960, 1010 (10th Cir. 2019) (stating supervisor may not "be held liable based on an unconstitutional policy where there is no evidence of a constitutional violation by any individual subordinate").

As Thompson again asserts qualified immunity as a barrier to liability, Plaintiff had the burden to show Thompson violated decedent's constitutional rights. *Lundstrom v. Romero*, 616 F.3d 1108, 1118-19 (10th Cir. 1012). In light of Plaintiff's failure to show that Jacobsen--Thompson's subordinate and the only other individual defendant in this case--violated decedent's constitutional rights, Plaintiff's claim against Thompson (as to constitutionally inadequate training and supervision) fails. The court grants summary judgment for Thompson and dismisses him.

### B. CLAIM AGAINST WEBER COUNTY

Plaintiff alleges that **Defendant Weber County** had policies and customs that violated decedent's federal constitutional rights. He asserts that Weber County failed to provide adequate medical treatment and training and supervision, as customs, policies, or practices in violation of the Fourteenth Amendment.

Weber County's potential liability is governed by these principles:

> "[A] municipality cannot be held liable under § 1983 on a respondeat superior theory." *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 691 (1978). Rather, a municipality can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Id.* at 690. Additionally, a city faces liability under § 1983 if a deprivation of constitutional rights is caused by a municipal "custom." *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 403 (1997); *Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1177 (10th Cir. 2003) ("'custom' has come to mean an act that,

>although not formally approved by an appropriate decision maker, has such widespread practice as to have the force of law.").

*Fuersch v. Southwest Airlines Co.*, 439 F.3d 1197, 1210 (10th Cir. 2006); *see also Bewley*, 1998 U.S. App. LEXIS 11737, at *17 ("In a § 1983 action, the [c]ity . . . may be held liable only for its own unconstitutional policies and not for the tortious or unconstitutional actions of its employees.").

"A municipality may be liable only if a municipal actor committed a constitutional violation." *Burke*, 935 F.3d at 998 (citing *Martinez*, 563 F.3d at 1092 (rejecting argument that "county can be liable, even if no individual government actor is liable")); *see also Bewley*, 1998 U.S. App. LEXIS 11737, at *17 ("[T]he [city] may not be held liable under [§ 1983] absent an underlying constitutional violation by its officers.") (citing *Thompson v. City of Lawrence*, 58 F.3d 1511, 1517 (10th Cir. 1995)).

Plaintiff contends decedent was harmed because Weber County had an unconstitutional policy or custom of providing inadequate medical treatment throughout intake and booking. However, because this Order grants summary judgment to Defendants Thompson and Jacobsen on the claim of inadequate medical care and training and supervision, there has not been the requisite conclusion that "a municipal actor committed a constitutional violation." *Burke*, 935 F.3d at 998. Summary judgment is thus granted for Weber County on the claim that it had an unconstitutional policy or custom regarding medical treatment throughout intake and booking.

## IV. CONCLUSION

Accordingly, **IT IS ORDERED** that:

**(1)** Based on qualified immunity, the individual defendants' summary-judgment motion is **GRANTED**. (ECF No. 26.)

**(2)** As to Defendant Weber County, summary judgment on the unconstitutional policy claim is **GRANTED**. (ECF No. 26.)

**(3)** This case is **CLOSED**.

DATED this 1st day of June, 2020.

BY THE COURT:

_____
CHIEF JUDGE ROBERT J. SHELBY
United States District Court